MYERS ET AL. V. FARMER ET AL.

1. **Judgment:** ASSIGNMENT OF: SURETY. A judgment was obtained against M. and others as sureties upon the bond of a public officer, from which M. did not appeal, but upon the appeal of the other defendants it was held that a portion of the deficit should be charged upon the officer's bondsmen for a previous term. Afterward the co-sureties of M. were released and the judgment against M. for the full amount of the deficiency was sold and assigned to a third party, the purchase being in fact made, however, and the money paid, by one of the sureties upon the first bond: *Held*, that the purchase operated in equity as a discharge of the judgment except as to the proportionate share of M. as surety upon the last bond.

*Appeal from Poweshiek District Court.*

WEDNESDAY, OCTOBER 8.

THE Independent School District of Montezuma obtained a judgment against the plaintiff Myers. His co-plaintiff, Carl Schultz, became liable therefor by reason of having signed a bond to stay execution. Afterward the school district assigned the judgment to the defendant Wilson Beall, who, at the expiration of the stay, caused execution to issue and to be put into the hands of the defendant, Farmer, as sheriff of Poweshiek county. This action is brought to enjoin the execution. The plaintiffs aver in substance that the judgment has been virtually paid by one or more persons who were liable for the indebtedness, and whose duty it was to pay the judgment. The transactions which resulted in the judgment were as follows: One Angus McDonald was treasurer of the Independent School District of Montezuma, from March 20, 1871, to June 4, 1873. Upon his official bond for the first year, one J. F. Head and several others were sureties. Upon his official bond for the second year the plaintiff, Myers, and two others, one Tilton and one Bosley, were sureties. During the first year McDonald made defalcations to the amount of $388.31, and during the second year to the amount of $273.62: in all amounting to $661.93. The school district brought suit upon the second bond against Myers and other sureties thereon

for the defalcation of both years. Myers made default and judgment for the whole amount was rendered against him. The other sureties defended, but judgment was rendered against them for the full amount also. McDonald had made payment enough during the second year to cover all deficits of the first year out of money collected during the second year, and so it was thought that all the deficits should be considered as accruing during the second year. The sureties other than Myers appealed, and this court reversed the judgment, holding that the sureties upon the second bond were not liable for the deficits of the first year, 39 Iowa, 564, and so judgment was rendered against the appellants for only such amount with interest as the receipts of money during the second year exceeded the payments during that year, to-wit, $273.62; and interest, amounting to $318.14. But as Myers did not appeal there stood against him judgment for the whole amount, to-wit: $672.41, a portion of which he paid. The school district brought an action upon the first bond against the sureties thereon for the deficits of the first year, intending to collect that amount out of the sureties upon that bond, leaving only such amount to be collected from Myers and his co-sureties as, according to the opinion of the Supreme Court, was really due from them. An idea, however, was conceived by the sureties upon the first bond, and Myers' co-sureties upon the second bond, that Myers, and Myers alone, ought to pay the full amount of all defalcations, whether occurring the second year or the first. This idea was based upon the supposition that Myers had the use and benefit of the school money, and was himself the cause of the defalcations. There was evidence showing that Myers and McDonald were partners in trade and evidence tending to show that the money was used by the firm and never accounted for to McDonald by the firm. To prevent, therefore, the further enforcement of the liabilities of these other parties, and to cause Myers to pay the whole, a scheme was devised by them and their attorney, W. R. Lewis, to procure an assignment of the judgment against Myers to a third party, who should have execution upon the same. Accordingly the firm of Head Bros., at the request of Lewis

made to one Mahlon Head, brother of J. F. Head, advanced $600 to the school district, and an assignment was taken of the judgment running to the defendant Beall, but which assignment was delivered to Head Bros., the transaction being conducted by Lewis.   The plaintiffs claim that these advancements operated, as between them and the other persons liable for the indebtedness, as a virtual payment and discharge of the judgment, at least as to all except such part as was Myers' contributory share.   The court found that his contributory share was $111, besides certain costs, and upon the order of the court that amount was paid by the plaintiffs, and thereupon the court entered a decree perpetually enjoining the collection of the balance of the judgment.   The defendants appeal.

*W. R. Lewis*, for appellants.

*W. H. Redman*, for appellees.

ADAMS, J.—The judgment against Myers was valid, however erroneously rendered.   The assignment executed as running to Beall, has been delivered to him.   He was charged by Head Bros., in account, with the six hundred dollars advanced by them.   He has approved the charge and accounted with them on that basis.   If the judgment is not valid in his hands it is because certain equities arose in favor of the plaintiffs by reason of the advancements, and because Beall took the judgment subject to such equities.

It is insisted that no equities could have arisen in the plaintiff's favor because he received and used the money belonging to the school district, and was himself the cause of the defalcations.   The plaintiff in his testimony denies the receipt and use of such money.   As to what the fact is, the evidence leaves us in doubt; but we do not feel called upon to determine it, because no issue of that kind is raised in the pleadings.   If Myers, or the firm of which he was a member, did receive the money, as some evidence tends to show, his liability therefor could be enforced against him as a debtor of McDonald.   We shall proceed then as if the rights and equities, as between the sureties, are as shown by the bonds and the undisputed facts in

regard to the deficits, taking the ruling in *Independent School District v. McDonald*, above referred to, as being a correct exposition of the law.

It is easy to be seen what should have been done under that ruling. Notwithstanding the judgment erroneously rendered against Myers for the whole amount, the sureties upon the first bond should have paid to the school district the deficit of the first year, leaving only the deficit of the second year to be paid by the sureties upon the second bond. The rendition of the judgment against Myers for the whole amount did not affect any other surety's liability. If the sureties upon the first bond had paid the deficit of the first year they could not have called upon Myers even for contribution. For while it is true that the erroneous rendition of the judgment against him for the whole amount made him legally liable for the deficit of the first year, he would not have been concluded by the judgment from showing the real equity as between him and the sureties upon the first bond. This is so because their relation to him was in no way dependent upon whether the school district did or did not obtain a judgment against him. It follows, then, that if they had paid the amount for which they were liable the payment would have worked a *pro rata* discharge of the judgment against Myers, and any attempt to put the transaction in the form of a purchase of the judgment would have been futile as between them and Myers, so far as that part is concerned which they, and not he, ought to pay. We come now to the turning point of the case. The money advanced in the first instance, by which the school district was paid, was not advanced by Beall. He lived in West Virginia. He was not consulted in the purchase. The school district was paid on the 13th day of December, 1875. Beall says in his testimony: "They (Head Bros.) bought this judgment, sent me a copy of the assignment and charged me in my account, December 22, 1875, $600. I had no correspondence with them prior to December 13, 1875, in reference to their purchase of the judgment for me. I first learned in January thereafter that they had purchased this judgment for me," At the time the money was advanced to the school district, Head Bros. had in their

hands $155 to $220 belonging to Beall, but there is no evidence that they had any authority to invest it for him without his approval of the investment in advance. He says: "Head Bros. have been acting as my agents to loan money and buy paper of different kinds; sometimes we agreed on special transactions, and sometimes I trusted to their statements, knowledge and judgment, to make safe loans and investments for me." In the statement of account rendered by them to him there appear but two investments made for him, an investment upon a mortgage of $450, and the transaction in question. It is abundantly evident that they had no general authority to use their discretion. If so the witness would most certainly have so stated. The $600, then, advanced by Head Bros. must be considered as wholly their money, and Beall was under no obligation to take the judgment and reimburse them. But Head Bros. made no purchase for themselves even in form. Whether if they had put the transaction in that form the case would have been different, we need not consider. What they did was to advance $600 to the school district as a part of the scheme whereby all the sureties except Myers were to be saved from loss. The effect was, we think, to discharge the judgment and create a liability in favor of Head Bros. against those for whose benefit the money was advanced. This was the condition before Beall had any knowledge of the judgment, or was even charged in account by Head Bros. therefor. The subsequent charge and delivery of the assignment to him could not have given him an equity superior to that of Myers. He took the assignment charged with all that Lewis, who procured the assignment, knew about it, and Lewis knew it was part of a scheme to shift upon Myers a liability which in equity the sureties upon the first bond, and not he, ought to discharge. In saying this we wish to be understood as speaking from the standpoint from which we are deciding the case. We are not prepared to say that Head Bros. or Lewis did anything which they supposed to be wrong. We are inclined to think that they honestly believed that Myers ought to pay the whole debt, and we are in great doubt as to whether their belief is not well founded. But, as we have said, we do not think that we can go into the

question as to whether the firm of which Myers was a member had received the school money as defendants claim, and had failed to account.

So far we have been considering only so much of the judgment as might be considered as rendered for the indebtedness which the sureties upon the first bond ought to pay. The other indebtedness was properly a claim against Myers, and so far as the judgment was rendered for that indebtedness it was properly rendered. The court below, however, held that Myers was liable for only $111, which we suppose was considered one-third. The appellant claims that he was liable for the whole of that part of the judgment at least. Myers was one of three sureties. Judgment was obtained against all. But at the time of the payment of the $600 the judgment as against Myers' two co-sureties was discharged. As this deprived Myers of the right to look to them for contribution, he claims that the discharge operated to release him from so much as he, upon payment of the whole, could have compelled his co-sureties to contribute. This would certainly be the ordinary rule, and this, we presume, was the idea of the court below. The defendants claim, however, that the rule is not applicable in this case. Myers stayed execution. It is contended by defendants that this had the effect to preclude him from looking to his co-sureties, because the judgment against him being stayed his co-sureties, upon payment, could not look to him until the stay had expired. So the argument is that Myers released them from the liability to contribution, and that when the school district released them from the judgment he was in no worse condition than that in which he had placed himself. This position, we think, is not well taken. Myers' co-sureties, we think, were not affected by the stay of execution. If they had paid the judgment their right of action against him would not have rested upon the judgment. *Johnston v. Belden*, 49 Iowa, 301. It would have rested upon an obligation implied by law, and there was nothing which Myers did or could do to impair that obligation, or in any way modify it to the injury of his co-sureties. It appears to us, therefore, that the release by the school district of Myers' two co-sureties had

the effect to release him from two-thirds of the judgment, notwithstanding the stay taken by him. The third for which he remained liable he has paid, as we understand, since the commencement of this action. We think he is not liable for anything more, and that the judgment of the court below should be

AFFIRMED.